533 P.2d 1177

**Alva Tom JONES, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Gary Williams and Son Contracting Company, Respondent Employer,**

**The Home Insurance Company, Respondent Carrier.**

**No. 1 CA–IC 1059.**

Court of Appeals of Arizona,
Division 1,
Department C.

April 15, 1975.

Jerome & Gibson, P. C., by D. A. Jerome, Phoenix, for petitioner.

Edward F. Cummerford, Chief Counsel The Industrial Commission of Arizona, Phoenix, for respondent.

Jones, Teilborg, Sanders, Haga & Parks, P. C., by William R. Jones, Jr. and Joseph L. Moore, Phoenix, for respondents employer and carrier.

## OPINION

STEVENS, Judge.

The basic problems presented by this review by certiorari are the presence or absence of a medical conflict relative to the causal relationship between the industrial accident and the petitioner's psychiatric condition, together with the resolution thereof, if a conflict exists.

Alva Tom Jones (petitioner), a 33-year old carpenter, sustained an industrially related accident when a beam fell on him on 27 April 1970. Following the 1970 incident he was taken to a hospital emergency room where he was seen by Gaylord E. Smith, M.D. Dr. Smith continued as the petitioner's attending physician until about 11 December 1970. On that date the petitioner wrote a letter requesting that his attending physician be changed to Alan L. Gordon, M.D. The carrier consented. Dr. Gordon declined to accept the transfer. The record indicates that Dr. Gordon stated that he prefers not to treat industrial cases.

Thereafter Leroy L. Merring, M.D. became the petitioner's attending physician and he so continued throughout the further processing of the claim. Dr. Merring is engaged in family practice. In this phase of medical practice doctors often develop some expertise in the field of psychiatry and Dr. Merring testified as to his experience in this field of medicine. Dr. Merring secured an examination by Harry A. Danielson, M.D., a neurosurgeon,[1] and later referred the petitioner to Thomas F. Kruchek, M.D., a psychiatrist. Dr. Kruchek saw the petitioner professionally several times during the period from 1 March 1972 to early 1973. Included in the Commission file are two reports from Dr. Kruchek. His first report is to Dr. Merring relative to his initial interview with the petitioner and we quote from the report.

"DIAGNOSTIC IMPRESSION:

"(1) That of possible conversion reaction.

"(2) Psycho-physiological musculoskeletal reaction.

"RECOMMENDATION:

"Further evaluation psychotherapy and medication as indicated. The chart was also reviewed."

The second report will be referred to later in the chronology of events outlined herein.

The petitioner appeared before a medical board composed of Dr. Merring, Dr. Danielson and Willard S. Hunter, M.D., an orthopedic surgeon. The file does not reflect whether the board was convened at the request of Dr. Merring or at the request of the carrier. The board rendered its report on 18 July 1972. The report concluded as follows:

"It is felt that this patient will have no permanent disability and there are no positive physical findings to prevent him from returning to work. He was advised to learn cervical outlet exercises under a physical therapists's direction. He is to do this at home. Other treatment consists of the utilization of aspirin and home traction. No further treatment or evaluation are necessary concerning the accident of 4–27–70, and this patient can be discharge [sic] when he has been instructed concerning the examination previously mentioned."

The medical consultation included a physical examination of the petitioner together with a review of the background of the in-

[1] It is noted that in 1966 the petitioner sustained a back injury from which he appears to have fully recovered. He was then seen professionally by both Dr. Merring and Dr. Danielson.

jury and medical records. The matter of the petitioner's claimed psychiatric problem was not considered by the board.

Dr. Merring reported to the carrier on 13 October 1972 and we quote the entire report.

"Mr. Alva Tom Jones was discharged 9–25–72, and I recommend 10% permanent disability regarding the neck and back and associated psychiatric reasons."

The carrier issued its notice of claim status on 30 October 1972. The petitioner employed counsel in December and a timely request for a hearing was filed addressed to the above-referred to notice of claim status.

Dr. Kruchek's second report was dated 6 February 1973 from which we quote.

"It is my recommendation that he be seen more actively and hospitalized for more definitive evaluation in order to explore more fully the conversion features and psychophysiological musculoskeletal reaction features of this injury. The industrial injury of April 27, 1970, did precipitate and/or aggravate the conditions described above and does require medical care and treatment in a hospital setting. Because of the injury, the patient is unable to work at the present time."

Shortly thereafter the carrier sought to have the petitioner examined by Richard E. H. Duisberg, M.D., a psychiatrist. There was an objection on behalf of the petitioner. The carrier sought and secured an order directing that the petitioner present himself to Dr. Duisberg for an examination. This examination was not held as will hereinafter appear. There was a five-phase hearing.

On 9 March 1973 the testimony of Dr. Merring and Dr. Kruchek was taken. At the conclusion of this phase of the hearing we find the following stipulation.

"MR. MIGNELLA: [the petitioner's attorney] For the record, Mr. Hearing Officer, the applicant would like to state that, pertaining to an order issued by the Hearing Officer in response to a letter from the carrier, that the carrier and the applicant, through their attorneys, have stipulated that another psychiatric examination is going to be carried out by Dr. McGrath.

"Is that right?

"MR. MOORE: [the respondents' attorney] So I understand."

Dr. Danielson testified on 13 April 1973 and his testimony was consistent with the medical consultation report. We find the testimony of William B. McGrath, M.D., a psychiatrist, on 18 May 1973. Dr. McGrath's report of his 10 April 1973 examination of the petitioner was received in evidence subject to the cross examination of the doctor. Referring to the previous stipulation, pursuant to which Dr. McGrath conducted his examination of the petitioner, the petitioner's counsel stated:

"Although the purpose of the stipulation, I think the record should reflect, was to agree on a doctor who would examine our client for the carrier. That was the only purpose for the stipulation."

The next phase of the hearing was held on 23 May 1973 at which time the petitioner and his wife both testified. In the final phase of the hearing the testimony of Dr. Hunter was received on 30 May 1973. Dr. Hunter's testimony corroborated that of Dr. Danielson as to the results of the 1972 consultation.

On 30 May 1973 the hearing officer issued his decision. The petitioner filed his motion for reconsideration urging that he was prejudiced by the fact that the hearing officer's decision was entered before the transcript of the 30 May phase of the hearing had been received and filed. The transcripts of all of the other phases of the hearing were a matter of record in the Commission file prior to 30 May. On 25 June 1972 the hearing officer filed an amended decision, the transcript of the 30 May proceedings then being of record. The proceedings before this Court are addressed to the 25 June 1973 amended decision.

The amended decision found that the petitioner's condition had become orthopedically stationary, a finding consistent with the testimony of Dr. Merring, Dr. Danielson and Dr. Hunter. The amended decision acknowledged that Dr. Merring, Dr. Kruchek and Dr. McGrath all recognized that as of the time of this series of hearings the petitioner had certain psychiatric problems. In relation thereto Dr. Merring testified that he had prescribed certain medication to relieve pain and to induce sleep. He testified as to the causal relationship between the petitioner's then psychiatric problems and the prescribing of medications and we quote his testimony.

"Q. Doctor, did you prescribe these as a result of problems emanating from the industrial injury of 4–27–70?

"A. Yes, I did."

Dr. Kruchek's testimony as to the causal relationship was affirmative and he stated his opinion that there was a causal relationship between the industrial incident and the petitioner's then psychiatric problems. Dr. McGrath recognized that initially there had been a causal relationship present but that in his opinion "compensation neurosis" had begun to influence the petitioner and we find the following questions and answers.

"Q. If I understood your earlier testimony that particular problem merits further examination, is that right?

"A. Yes.

"Q. And there could be a causal relationship to his industrial injury, is that right?

"A. In my opinion there is medical probability that there is no connection."

The amended decision of the hearing officer found that there was an absence of a residual psychiatric causal relationship, this finding being in accord with Dr. McGrath's testimony. At the oral argument the petitioner urged that Dr. Kruchek was the carrier's doctor. At the oral argument and in his brief the petitioner urged that the carrier had not asked Dr. Kruchek for his report. The carrier was accused of doctor shopping.

The file reflects that in addition to Dr. McGrath the carrier paid the medical fees for more than 15 medical doctors who had seen the petitioner, including Drs. Danielson, Merring and Kruchek. By law the carrier is charged with knowledge of Dr. Kruchek's reports contained in The Industrial Commission file. The carrier sought a consultation between the petitioner and Dr. Duisberg and when there was an objection on behalf of the petitioner it was stipulated that the petitioner would be examined by Dr. McGrath. It is not unusual in contests involving personal injuries, whether the contest be in civil suits or before The Industrial Commission, to secure a physical examination and evaluation of the injured person for the purpose of obtaining the opinion of a medical doctor. Sometimes this independent examination is favorable to the claims of the injured person and sometimes it is not. The examining physician testifies and thereby a conflict of medical testimony may exist. The trier of fact be it the jury, the judge of the Superior Court trying a case without a jury, or The Industrial Commission through its hearing officers weighs, evaluates and resolves the conflict. We find no basis for charging the carrier with bad faith.

## TRAVEL EXPENSES

In his initial report of injury the petitioner gave as his address his mother's Phoenix address. The petitioner testified that it was at his mother's address that he received his official mail and his tax forms. While he testified that his wife and children lived in Yavapai County which he considered to be his residence and where he spent as much time as employment would permit as well as the majority of his time following the April 1970

**444**

industrial episode, no effort was made to change his official address in the records of The Industrial Commission proceedings or secure travel money for his medical appointments in Phoenix until his examination by Dr. McGrath and the carrier paid the expenses of that travel. There is a letter in the file dated 5 March 1973 written by the carrier's attorney which acknowledged that the petitioner's attorney had suggested that travel payments should be made. Even had the hearing officer found that the petitioner was a resident of Yavapai County and was entitled to reimbursement for his travel expenses, the evidence presented was insufficient upon which to calculate a sum for reimbursement. The opening brief states, "it certainly should not be beyond the ability of the respondent insurance carrier, working from its own records, to determine this administratively." In our opinion the burden rested with the petitioner.

There is a suggestion that the petitioner had excellent hearing before the industrial incident and experienced a partial hearing loss following the industrial incident. Our review of the record does not disclose medical evidence to sustain a causal relationship between the accident and the hearing loss nor does the hearing loss appear to have been a litigated issue.

Our reading of the entire record convinces us that the decision of the hearing officer finding an absence of permanent physical or mental residual disability causally related to the 27 April 1970 episode is supported by the evidence, the hearing officer having resolved the medical conflict as to the causal relationship between the accident and the psychiatric problems which the petitioner was experiencing at the time of the hearing.

The award is affirmed.

NELSON, P. J., and WREN, J., concur.